**MEDICAL AND PROFESSIONAL COLLECTION SERVICES, INC., Appellant–Plaintiff,**

v.

**Frank BUSH and Steven Bush, Appellees–Defendants.**

No. 82A04–9912–CV–554.

Court of Appeals of Indiana.

Aug. 28, 2000.

F. Stephen Sheets, Evansville, Indiana, Attorney for Appellant.

Terry A. White, Evansville, Indiana, Attorney for Appellees.

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Medical and Professional Collection Services, Inc. ("Medpro") appeals the trial court's judgment in favor of Frank Bush ("Father") and his adult son, Steven Bush ("Son"). We affirm.

### Issues

Medpro presents various issues,[1] which we consolidate and restate as follows:

I. whether the trial court applied the correct version of the law;

II. whether sufficient evidence supported the judgment; and

III. whether the trial court committed reversible error by limiting Father's testimony.

### Facts and Procedural History

The facts most favorable to the judgment reveal that Father and his wife, Mary Bush ("Mother"), bought their house in 1978. They refinanced the house several times in the years that followed. In 1991, Mother became ill, entered St. Mary's Medical Center ("St. Mary's"), and died. Before Mother's death, Father signed a guarantee of payment for St. Mary's services.

By 1992, Father owed approximately $22,000 in mortgages on the house, which was worth between $40,000 and $45,000. Since 1991, Son has advanced Father over $20,000, approximately $10,000 before 1992 and the rest thereafter. Father used the money to make payments on bills, including his hospital bills and doctor bills. Father agreed to quitclaim his house to Son on January 14, 1992 as payment for the money advanced. Subsequently, Father suffered a heart attack and strokes and received a pacemaker. He was then unable to make payments to St. Mary's.

In July 1995, Medpro, the assignee of St. Mary's, obtained a default judgment against Father and then placed a lien on the house.[2] In 1997, Father moved out of

---

1. Medpro also asserts constructive fraud as a theory of recovery. However, having first raised this issue on appeal, Medpro has waived consideration of constructive fraud. *See Essex v. Ryan*, 446 N.E.2d 368, 370 (Ind. Ct.App.1983) (concluding that appellants "have waived consideration of constructive fraud for purposes of this appeal, for appellants may not introduce new substantive theories for the first time on appeal.").

2. The default judgment was in the amount of $66,568.07 together with court costs.

the house. Son attempted to refinance the house in April 1998. At that time, the lender required that Son record the deed, which he did. In August 1998, Medpro filed a complaint seeking to avoid a transfer of real estate from Father to Son either entirely or to the extent necessary to satisfy Medpro's judgment against Father. On October 14, 1998, Father and Son denied the claim and filed a counterclaim for declaratory relief. Approximately one year later, a bench trial was held. On November 24, 1999, the court entered judgment against Medpro on its complaint, found in favor of Father and Son on their counterclaim, and declared null and void Medpro's lien on the house.

## Discussion and Decision

### I. Proper Version of Statute

■ On January 14, 1992, the date of the quitclaim deed, Indiana Code Sections 32–2–1–14 through –18 were in effect. By the time of the recording of the deed, the Indiana Uniform Fraudulent Transfer Act ("the Act")[3] had replaced Indiana Code Sections 32–2–1–14 through –18. On appeal, Medpro contends, "[e]quity requires that in this case the date of the transfer for purposes of application of Indiana's fraudulent transfer laws ... be deemed April 27, 1998, the date of recording of the deed." According to Medpro, the Act, rather than the older sections of the Code, should apply.

■ The Act's application section provides:

(a) This chapter applies to all transfers made and obligations incurred after June 30, 1994.

(b) *This chapter does not apply to a transfer made or an obligation incurred before July 1, 1994.*

---

**3.** *See* IND.CODE §§ 32–2–7–1 to –21, enacted in 1994.

**4.** We note that "includes," rather than being a limiting term, implies a non-exhaustive list, especially here where Indiana Code Section 32–2–7–10 also states, "or other encumbrance."

IND.CODE § 32–2–7–1 (emphasis added). The Act defines "transfer" as "*any mode* of disposing of or parting with an asset or an interest in an asset whether direct or indirect, absolute or conditional, or voluntary or involuntary." IND.CODE § 32–2–7–10 (emphasis added). This section also indicates that transfer "includes[4] payment of money, release, lease, and creation of a lien or other encumbrance." *Id.* The Act does not define "obligation." Absent a precise legislative definition, we use a term's plain and ordinary meaning. *See Indiana Dep't of Human Servs. v. Firth,* 590 N.E.2d 154, 157 (Ind.Ct.App.1992), *trans. denied.* Obligation has been called a "generic word" with "many, wide, and varied meanings, according to the context in which it is used." BLACK'S LAW DICTIONARY 1074 (6th ed.1990). Obligation has been defined as "[t]hat which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc. Law or duty binding parties to perform their agreement." *Id.* We conclude that our legislature's decision to draft the application section so broadly indicates its intent to include as many conveyances as possible within the purview of the Act. That the Act does not mention recording, let alone make it a prerequisite for a transfer or obligation to be governed by the Act, supports our construction of the statute. Indeed, our legislature set out only one explicit restriction on the Act's application: the date restriction. The present transfer or obligation occurred on January 14, 1992, the date the quitclaim deed was executed. As such, the trial court correctly applied Indiana Code Sections 32–2–1– 14, –15, and –18, rather than the Act.[5]

---

**5.** Without citation or extensive argument, Father and Son assert that because Medpro acquiesced to the application of the older law, it waived the argument that the trial court should have applied the Act. In its complaint against Father and Son, Medpro cited the Act. However, at trial, Medpro clarified that: (1) it had mis-cited the applicable law in its

## II. Sufficient Evidence

Medpro contends that even if the older version of the law applies, it proved actual intent to defraud by showing a transfer for no consideration or insufficient consideration at a time when the transferor was insolvent.

Almost thirty years ago, we set out the proper standard of review in such cases.

> In attacking the trial court's negative decision and the failure of it to grant the relief requested on the Plaintiff–Appellant's complaint all of the factual inferences must be considered in the light most favorable to the trial court's decision and the Appellant here must conclusively prove as a matter of law such decision was erroneous. The reviewing court on appeal will disregard conflicting evidence and assume that evidence to support the finding is true and will give it every inference reasonable and favorable to be drawn from it. The reviewing court on appeal will not weigh the evidence or pass upon the creditability of witnesses.

*Kourlias v. Hawkins*, 153 Ind.App. 411, 413, 287 N.E.2d 764, 765–66 (1972).

■ A conveyance of real estate "made with the intent to hinder, delay or defraud creditors or other persons of their lawful damages" shall be void as to the person sought to be defrauded. IND.CODE § 32–2–1–14. Medpro, as the judgment creditor seeking to have the transfer set aside as fraudulent, had the burden of proof to show that such transfer was made with the aforementioned intent. *See Kourlias*, 153 Ind.App. at 413, 287 N.E.2d at 766. "The question of fraudulent intent is deemed a question of fact." *Diss v. Agri Business Intern., Inc.*, 670 N.E.2d 97, 99–100 (Ind.Ct.App.1996). "Lack of consideration alone is not enough to support a charge of fraud." *Id.* at 100. Rather, fraudulent intent may be inferred from

various factors or "badges of fraud" present in a given transaction, including:

1. the transfer of property by a debtor during the pendency of a suit;

2. a transfer of property that renders the debtor insolvent or greatly reduces his estate;

3. a series of contemporaneous transactions which strip a debtor of all property available for execution;

4. secret or hurried transactions not in the usual mode of doing business;

5. any transaction conducted in a manner differing from customary methods;

6. a transaction whereby the debtor retains benefits over the transferred property;

7. little or no consideration in return for the transfer;

8. a transfer of property between family members.

*Otte v. Otte*, 655 N.E.2d 76, 81 (Ind.Ct. App.1995). As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent. *Id.*

■ Here, testimony revealed that Son had advanced Father approximately $20,-000, which was equivalent to the equity in the house. The money was not a gift. Father used the money to pay bills including St. Mary's bills. Son continued to pay the mortgages on the house. At the time of the 1992 quitclaim transfer from Father to Son, Father was still making payments to St. Mary's. Father also had a one-half interest in fifty-three acres of woodland, which he subsequently sold to pay his bills. Father did not consider St. Mary's when he quitclaimed his house to Son because Son was helping him ease his financial burden. Father intended to try to pay St. Mary's, but eventually could not after his health problems arose.

complaint; and, (2) it agreed that the older version of the law applied. Having already concluded on the merits that the trial court

properly applied the older law, we need not decide this waiver issue.

Because he saw the parties to this case in court as witnesses, the trial judge was in a far better position to determine the crucial questions of intent and credibility here. *See Kourlias,* 153 Ind.App. at 413, 287 N.E.2d at 766. While the evidence was susceptible to more than one inference, we cannot say as a matter of law that the only inference permissible is the one favoring Medpro. Also, in this case the trial court may have determined that Medpro failed to sustain its burden of proof. *See id.* Viewing the evidence most favorable to the judgment, we cannot say the trial court erred in this regard.

### III. Limited Testimony

██ Finally, Medpro maintains that the trial court abused its discretion when it limited the testimony of Father. We will reverse a trial court's decision regarding the admission or exclusion of evidence only for an abuse of discretion. *Kelley v. Watson,* 677 N.E.2d 1053, 1059 (Ind.Ct.App. 1997), *trans. denied.*[6] An abuse of discretion occurs only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* "Erroneously excluded evidence requires reversal only if the error relates to a material matter or substantially affects the rights of the parties." *Ridgeway v. Teshoian,* 699 N.E.2d 1156, 1161 (Ind.Ct.App.1998). Error in the exclusion of evidence is not grounds for reversal unless our refusal to reverse would be inconsistent with substantial justice. *Id.*

Although Father answered many of Medpro's questions during direct examination, he did not know the answers to some and was confused by others. For instance, when asked whether he knew that Son did not record the quitclaim deed until 1998, Father replied, "No, I didn't know. I didn't know nothing about it." Medpro's

direct examination of Father continued as follows:

Q. When did you learn that that had happened?

A. I didn't learn I don't think until they sued me over it or something. I don't know what it was. I don't remember. Like I told you I had that stroke. I lost my memory. I don't remember half of what I'm supposed to remember.

Q. So you really don't remember what you thought of in 1991 with regard to St. Mary's Hospital when you gave that house to your son?

A. When I signed that, he helped me.

Q. And you didn't think anything about St. Mary's Hospital not having the benefit of at least a portion of that —

A. I was still going to try to do it but I couldn't. I got sick. I couldn't. I had heart surgery. I had a stroke. I had a pacemaker put in.

Q. Let me make it a little easier for you. Let's just say to take some kind of a figure let's say —

BY THE COURT: Just a minute. May I see counsel and your other client? (WHEREUPON AN OFF THE RECORD DISCUSSION TOOK PLACE BETWEEN COURT AND COUNSEL AND [SON]).

Q. [Father], let's assume for a moment —

BY THE COURT: First of all, [Father], I know this is kind of stressful for you but don't worry about it. Just listen to — Are you okay?

(TRIAL RECESSES).

(TRIAL RESUMES).

BY THE COURT: [Father] is not feeling well and I'm not going to subject him to getting back on the stand. I

---

6. *See Shepherd v. State,* 690 N.E.2d 318, 325 (Ind.Ct.App.1997) (noting trial court's broad discretion in controlling trial procedures), *trans. denied; see also* Ind. Evidence Rule 611(a) ("The court shall exercise reasonable control over the mode ... of interrogating

witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.").

think what other information you want you will be able to get from [Son] and [defense counsel], you're just going to have to forego any cross-examination of [Father] that you were anticipating.

[Defense counsel]: I will.

BY THE COURT: Do you want to call —

[Medpro's counsel]: The record will show however that we had some more questions we wanted to ask him. The question that I was going to ask him was that recorded on the record when I was standing —

BY THE COURT: I have no idea. I don't recall.

[Medpro's counsel]: Could I then by agreement simply restate what I would have asked him for the record?

[Defense counsel]: Sure.

[Medpro's counsel]: For the record I would have asked [Father] if the amount of money that he received from his son was not reasonably equivalent to the value of the house, did he think at the time of the transfer that St. Mary's would not be able to have access to the money that was in the house as equity for which he did not receive sufficient and equivalent consideration. Basically that's the question. I might have tried to use simpler language for him. I wanted to know if he thought about St. Mary's Hospital losing a substantial amount of the equity that they could have gotten in the house when he made the transfer.

[Defense counsel]: I don't have an objection to that but I thought that that had already been asked and answered.

BY THE COURT: He had testified that he was doing that to get money to keep paying bills. That may have been answered previously, but I think the record also needs to reflect that apparently [Father] has unfortunately previously suffered a stroke, that he's had a heart attack and surgery associated with that and a pacemaker I believe he's indicated. How old is [Father]?

[Son]: Seventy-two.

BY THE COURT: He appears to the Court to be somewhat frail and I did not want to risk any damage particularly in view of the fact that [Son] is available to answer some questions also.

For a variety of reasons, we do not believe that the court abused its discretion by terminating the questioning of Father. Father was a seventy-two year old man in very poor health who was clearly suffering stress from the direct examination. The court first attempted less drastic measures than cessation of testimony, but to no avail. For example, prior to halting Father's testimony, the trial court asked that Medpro's counsel "slow it down a little bit." In addition, Medpro demonstrated no prejudice as a result of Father's abbreviated testimony. As the excerpts above and below indicate, the question for which Medpro claimed not to have received a response had already been asked and answered:

> [Medpro's counsel]: So [Son] didn't formally assume any kind of a mortgage? He didn't go and sign papers at the bank to take over the mortgage?
>
> [Father]: They wouldn't let him would they?
>
> [Medpro's counsel]: Do you know if he did that or not?
>
> [Father]: No, I don't think he did. I don't know. I really don't know.
>
> [Medpro's counsel]: Did it enter your mind that if you gave the house to your son that perhaps that house and your money that you had in it St. Mary's wouldn't be able to get?
>
> [Father]: No. I didn't even think when I signed it over. He was helping me. He offered to help me and that's what I'd take. I needed the help bad.

Moreover, unlike Defense counsel, Medpro did have some opportunity to question Father in court. Further, Medpro was permitted to question Son regarding the rele-

vant matters. Under these circumstances, we conclude that the court's decision to terminate Father's testimony was not reversible error.

Affirmed.

DARDEN, J., and MATTINGLY, J. concur.